UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOANN REGELS,

                    Plaintiff,

v.                                                    1:13-CV-0638
                                                      (GTS/RFT)
PATROLMAN NICHOLAS J. GIARDONO,
Schenectady Police Dep't; PATROLMAN
MICHAEL J. FARRAND, Schenectady Police
Dep't; and CITY OF SCHENECTADY,

                    Defendants.
_____

APPEARANCES:                                          OF COUNSEL:

OLIVER LAW OFFICE                                     LEWIS B. OLIVER, JR., ESQ.
  Counsel for Plaintiff
156 Madison Avenue
Albany, NY 12202

CARTER, CONBOY, CASE, BLACKMORE,                      MICHAEL J. MURPHY, ESQ.
MALONEY & LAIRD, P.C.                                 WILLIAM C. FIRTH, ESQ.
  Counsel for Defendants
20 Corporate Woods Boulevard
Albany, NY 12211

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

        Currently before the Court, in this civil rights action filed by Joann Regels ("Plaintiff")

against Patrolman Nicholas J. Giardono, Patrolman Michael J. Farrand and the City of

Schenectady ("Defendants"), are Defendants' motion for summary judgment and Plaintiff's

cross-motion for summary judgment.  (Dkt. Nos. 24, 33.)  For the reasons set forth below,

Defendants' motion is granted, and Plaintiff's cross-motion is denied.

# TABLE OF CONTENTS

I.   RELEVANT BACKGROUND..................................................................3
     A.   Plaintiff's Claims................................................................3
     B.   Statement of Undisputed Material Facts................................................4
          1.   Events of January 2012 Through May 2012.................................4
          2.   Events of June 3, 2012.............................................5
          3.   Events of June 4, 2012–Before Calling of Police........................6
          4.   Events of June 4, 2012–After Arrival of Police........................8
          5.   Events of June 4, 2012–After Arrival at Police Department..............16
          6.   Events of June 5, 2012.............................................19
          7.   Events of June 6, 2012.............................................20
          8.   Events of June 13, 2012............................................20
          9.   Plaintiff's Criminal Proceeding.....................................22
          10.  Schenectady Police Department's General Order 0-36.................23
     C.   Briefing on Parties' Motions for Summary Judgment........................24
          1.   Defendants' Motion for Summary Judgment............................24
          2.   Plaintiff's Response and Cross-Motion for Summary Judgment............29
          3.   Defendants' Reply and Response....................................34

II.  GOVERNING LEGAL STANDARDS.....................................................37
     A.   Standard Governing Motions for Summary Judgment........................37
     B.   Standards Governing Plaintiff's Claims and Defendants' Defenses...............39

III. ANALYSIS.........................................................................39
     A.   Plaintiff's First Claim (for Invasion of Privacy / Illegal Search)..............39
     B.   Plaintiff's Second Claim (for False Arrest)....................................40
     C.   Plaintiff's Third, Fifth and Ninth Claims (for False Arrest, Assault
          and Battery, and Negligence)............................................44
     D.   Plaintiff's Fourth Claim (for Excessive Force)...............................44
     E.   Plaintiff's Sixth and Seventh Claims (for Malicious Prosecution)..............45
     F.   Plaintiff's Eighth Claim (for Municipal Liability)............................46
     G.   Plaintiff's Claim for Punitive Damages.....................................47
     H.   Plaintiff's Cross-Motion for Summary Judgment...........................47

# I.    RELEVANT BACKGROUND

## A.    Plaintiff's Claims

Generally, in her Amended Complaint, Plaintiff alleges that, on June 4, 2012, Defendant Officers entered her apartment in Schenectady without justification, falsely arrested her for harassing her daughter, used excessive force against her in effecting that arrest (by grabbing her and slamming her against her bed without justification, causing her to land partially on the floor), and then maliciously prosecuted her for both harassment in the second degree and resisting arrest (the former charge being subsequently dismissed following a jury trial, and the latter charge being dismissed by a city court judge upon Plaintiff's motion).  (Dkt. No. 10.)  Plaintiff further alleges that Defendant City maintained an unconstitutional policy requiring that police officers make arrests in all domestic violence cases, and that it negligently maintained the detention cell in which she was confined for eight hours (causing her to catch and injure her arm between a wooden cot and a cement wall).  (*Id.*)

Based on these factual allegations, Plaintiff asserts the following nine claims against Defendants: (1) a claim that Defendant Officers invaded her privacy and subjected her to an illegal search under the Fourth Amendment; (2) a claim that Defendant Officers illegally detained her under the Fourth Amendment; (3) a claim that Defendant Officers falsely arrested her under New York State common law; (4) a claim that Defendant Officers used excessive force against her under the Fourth Amendment; (5) a claim that Defendant Officers subjected her to assault and battery under New York State common law; (6) a claim that Defendant Officers subjected her to malicious prosecution under the Fourth Amendment; (7) a claim that Defendant Officers subjected her to malicious prosecution under New York State common law; (8) a claim that

Defendant City is liable as a municipality by adopting and/or promulgating a policy that encouraged and/or caused the constitutional violations alleged, specifically, a policy mandating that police officers make an arrest when responding to calls alleging domestic violence; and (9) a claim that Defendant City negligently maintained the detention cell in which Plaintiff was confined, causing her personal injury, under New York State common law. (*Id.*)

**B.     Statement of Undisputed Material Facts**

The following facts are undisputed in the record currently before the Court.[1]

**1.     Events of January 2012 Through May 2012**

Plaintiff began renting her apartment at 266 State Street, Apartment B, in Schenectady in approximately January of 2012. The front door to the apartment opens into a living room, off of which is a bedroom. As one walks through the living room, one goes into a kitchen, through which is a bathroom. By the kitchen, also in the back of the apartment, is a storage room used only for storage.

Plaintiff's adult daughter,[2] Colleen Fountain, began staying with Plaintiff in early May

---

[1]     The Court notes that Local Rule 7.1(a)(3) of the District's Local Rules of Practice requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which shall (1) "admit[] and/or deny[] each of the movant's assertions in matching numbered paragraphs," and (2) support each denial with "a specific citation to the record where the factual issue arises." N.D.N.Y. L. R. 7.1(a)(3). Any responses that do neither of these things is effectively an "admi[ssion]" of the fact asserted. *Id.* ("<u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>.") (emphasis in original).

[2]     (Dkt. No. 33, Attach. 25, at 16 [Plf.'s Depo. Tr., indicating that, as of August 20, 2014, Ms. Fountain was 31 years old]; Dkt. No. 33, Attach. 2, at ¶ 4 [Plf.'s Rule 7.1 Statement].)

2012, while her own apartment was being painted.[3]  When Ms. Fountain came to stay with Plaintiff, she brought with her food, clothing, toiletries, a plastic dresser, garbage and cloth bags, makeup, a blanket, a pillow and a cat.  The plastic dresser had three drawers, was approximately three feet tall, was made out of a Tupperware-like material, and had a white plastic top.  When she stayed at Plaintiff's apartment, Ms. Fountain slept on a couch in the living room.

Plaintiff provided Ms. Fountain with a key to the apartment, which Ms. Fountain kept during her residency there.  Ms. Fountain was permitted by Plaintiff to enter the apartment and to leave it as she pleased, even when Plaintiff was not present.  While living at the apartment, Ms. Fountain would purchase food to be consumed by both Plaintiff and her.

### 2.    Events of June 3, 2012

At approximately 11:00 p.m. on Sunday, June 3, 2012, Plaintiff called the Schenectady Police Department due to an argument she was having with Ms. Fountain.  During the call, she told the dispatcher that she wanted the police to remove Ms. Fountain from her apartment.

As a result of Plaintiff's call, two Schenectady police officers (neither of whom is a party to this action) arrived at her apartment.  One of the two officers was Officer Anthony Savignano.  Officer Savignano was present on scene for approximately 22 minutes.  During that time, Plaintiff told the officers that she wanted Ms. Fountain to leave and why.

The officers questioned Plaintiff how long Ms. Fountain had been staying at the

_____

[3]        (Dkt. No. 33, Attach. 26, at 22-23 [Fountain Depo. Tr., indicating that she moved out of her apartment because "[t]he landlord wanted to do the entire whole downstairs over"]; Dkt. No. 33, Attach. 2, at ¶¶ 5-6 [Plf.'s Rule 7.1 Statement].)

apartment. Plaintiff explained that Ms. Fountain had been staying there for more than a month.[4]

In addition, the officers were told (by either Plaintiff or Ms. Fountain) that Ms. Fountain had

personal belongings at the apartment.

Ms. Fountain told the officers that she did not want to leave the apartment. The officers

told Ms. Fountain that, because she had been there for over a month, the apartment became her

legal residence and she did not need to leave. Plaintiff informed the officers that the apartment

was not Ms. Fountain's legal residence, which was 1329 Alden Place. However, the officers told

Plaintiff that, if Ms. Fountain had been at the apartment for 30 days, then it became her legal

residence and she did not have to leave.

The incident ended without any arrests or Ms. Fountain leaving Plaintiff's apartment.[5]

### 3. Events of June 4, 2012–Before Calling of Police

At approximately 8:00 a.m. or 9:00 a.m. on Monday, June 4, 2012, Plaintiff awoke,

exited her bedroom and watched television in the living room with Ms. Fountain. The two of

them ate pizza for lunch and watched television. Between noon and 2:45 p.m., Plaintiff drank

three or four beers (and part of another beer), took two Benadryl pills, probably took Prevacid,

---

[4]     (Dkt. No. 33, Attach. 3, at ¶ 20 [Plf.'s Rule 7.1 Response, stating "Plaintiff Regels informed the officers . . . that Ms. Fountain had been staying there for over a month . . . ."]; Dkt. No. 33, Attach. 25 at 28 [Plf.'s Depo. Tr.]; Dkt. No. 24, Attach. 6, at 13 [attaching page "40" of Fountain's Depo. Tr.].)

[5]     (Dkt. No. 33, Attach. 25 at 27-28 [Plf.'s Depo. Tr.]; Dkt. No. 24, Attach. 6, at 13-15 [attaching pages "40" through "42" of Fountain's Depo. Tr.]; Dkt. No. 24, Attach. 7, at 1 [attaching page "43" of Fountain's Depo. Tr.]; *cf.* Dkt. No. 33, Attach. 2, at ¶ 33 [Plf.'s Rule 7.1 Statement].)

and possibly took Lexapro.[6]  At approximately 1:30 p.m. or 2:00 p.m., Plaintiff and Ms. Fountain

got into an argument about Ms. Fountain not leaving the apartment.  Plaintiff again asked Ms.

Fountain to leave, and Ms. Fountain responded that she had no reason to leave and that she was

not going to do so.

Nonetheless, Ms. Fountain attempted to get in touch with her brother or father so that

they could pick her up and take her and her belongings from the apartment.  As Ms. Fountain was

attempting to reach her brother or father, Plaintiff decided to take back some clothing from Ms.

Fountain because of the disrespect Ms. Fountain had been showing her: as a result, Plaintiff

demanded the return of the clothing that she had given to Ms. Fountain as a gift approximately

four days before (which consisted of some underwear, some shirts and possibly jeans).[7]

Believing the underwear was in Ms. Fountain's dresser, Plaintiff went toward the dresser and

asked where the underwear was.[8]  In an effort to guard her belongings, Ms. Fountain ran over and

sat on top of her dresser and refused to remove herself from it, despite Plaintiff's two demands

for her to do so.[9]  Plaintiff then grabbed Ms. Fountain's arm, despite the fact that Ms. Fountain

---

[6]     (Dkt. No. 33, Attach. 25, at 36-41, 67 [attaching pages "36" through "39," "42," and "68" of Plf.'s Depo. Tr., admitting part of fact asserted above]; Dkt. No. 33, Attach. 26, at 66-68 [Fountain's Depo. Tr., establishing remainder of fact asserted above].)

[7]     (Dkt. No. 33, Attach. 3, at ¶ 24 [Plf.'s Rule 7.1 Response]; Dkt. No. 33, Attach. 25, at 42-45 [attaching pages "43" through "46" of Plf.'s Depo. Tr.]; Dkt. No. 33, Attach. 2, at ¶¶ 41-42 [Plf.'s Rule 7.1 Statement].)

[8]     (Dkt. No. 33, Attach. 3, at ¶ 25 [Plf.'s Rule 7.1 Response, admitted or failing to deny fact asserted above]; Dkt. No. 33, Attach. 25, at 46-47 [attaching pages "47" and "48" of Plf.'s Depo. Tr.]; Dkt. No. 33, Attach. 2, at ¶ 42 [Plf.'s Rule 7.1 Statement].)

[9]     (Dkt. No. 33, Attach. 3, at ¶ 26 [Plf.'s Rule 7.1 Response, admitted or failing to deny fact asserted with supporting record citation]; Dkt. No. 33, Attach. 25, at 47 [attaching page "48" of Plf.'s Depo. Tr.]; Dkt. No. 33, Attach. 2, at ¶ 42 [Plf.'s Rule 7.1 Statement].)

had not requested help getting off the dresser or demonstrated a need for such help.[10]  After

Plaintiff stopped grabbing Ms. Fountain's arm for several minutes, a red mark was visible.[11]

### 4.     Events of June 4, 2012–After Arrival of Police

At 3:20 p.m., Plaintiff walked away from Ms. Fountain and called the Schenectady Police

Department with the intention of having Ms. Fountain removed from the apartment.  She told the

police dispatcher that the call of a non-emergency nature, but requested police assistance in the

removal of Ms. Fountain from her apartment. Twice during the call, she falsely stated that Ms.

Fountain was stealing her clothing.  In addition, she twice stated that she had attempted to pull

Ms. Fountain off of a dresser.  She also acknowledged that Ms. Fountain's arm had a "mark" on

it as a result of Plaintiff's attempting to pull her off of the dresser.  Three times she

acknowledged that she had grabbed Ms. Fountain's arm.  Finally, she lied to the dispatcher that

she had not been drinking alcohol, and that she had been in bed all day.[12]

When Plaintiff called the Schenectady Police Department on June 4, 2012, she wanted

---

[10]      (Dkt. No. 33, Attach. 3, at ¶ 27 [Plf.'s Rule 7.1 Response, failing to support partial denial with a record citation]; Dkt. No. 33, Attach. 25, at 48, 65 [attaching pages "49" and "66" of Plf.'s Depo. Tr.]; Dkt. No. 33, Attach. 26, at 50, 54 [Fountain's Depo. Tr.].)

[11]      (Dkt. No. 33, Attach. 3, at ¶ 28 [Plf.'s Rule 7.1 Response, failing to deny the duration of the grabbing]; Dkt. No. 33, Attach. 25, at 48-49 [attaching pages "49" and "50" of Plf.'s Depo. Tr., establishing presence of red mark after grabbing]; Dkt. No. 33, Attach. 26, at 54, 55, 56, 138 [attaching pages "54," "55," "56" and "138" of Fountain's Depo. Tr., establishing presence of red mark after grabbing]; Dkt. No. 24, Attach. 11, at 1 [Domestic Incident Report, describing injury as "Right arm redness, minor pain"]; Dkt. No. 24, Attach. 11, at 2 [Domestic Incident Report, attaching statement of Ms. Fountain, stating, *inter alia*, "My arm was red and did hurt due to her pulling on it"].)

[12]      (Dkt. No. 33, Attach. 3, at ¶ 37 [Plf.'s Rule 7.1 Response, failing to deny latter fact asserted above and/or support such a denial with an accurate record citation]; Dkt. No. 33, Attach. 25, at 65, 115 [attaching pages "66" and "115" of Plf.'s Depo. Tr.]; Dkt. No. 30, at 2:15 to 2:23 [Defs.' Ex. R, containing dispatch recording starting at 15:20:46 on June 4, 2012].)

police to come to her apartment, and she did not object to police coming to her apartment. In fact, during the call, she was told by the dispatcher that police would be coming to her apartment shortly and that they would be investigating the incident as described by her. Indeed, the dispatcher specifically said to Plaintiff, "Okay, well, I'm not saying that the officers are going to arrest you [on Ms. Fountain's charge that you hit her]; I'm not saying they're not; I don't really know; it's at their discretion when they arrive, okay?" to which Plaintiff responded, "All right, thank you."[13] At the time of the call, Plaintiff expected that the police would *enter* her apartment.[14] After Plaintiff finished the call, she went into her bedroom and Ms. Fountain remained in the kitchen.

While driving to the location, Defendant Giardono asked the dispatcher whether there had been a call to the same address the night before, and the dispatcher responded affirmatively. The Remarks Detail for the call ("call remarks") states that "co[mplainant's] daughter is here and she shouldnt be." The call remarks also state that "[complainant's daughter] is trying to take clothes that the co[mplainant] bough[t]." The call remarks would have been sent to the computer into Defendant Officers' police cars at the time of dispatch, and Defendant Officers would have been able to view all of the information on the call remarks. Officer Giardono "might have had the unit history [up] on the computer" when he was in his police car. The unit history would show all calls to the address to which the officer was being dispatched. If he had the unit history up, he

---

[13]     (Dkt. No. 30, at 2:50 to 2:58 [Defs.' Ex. R, containing dispatch recording starting at 15:20:46 on June 4, 2012].)

[14]     (Dkt. No. 24, Attach. 24, ¶ 40 [Defs.' Statement of Material Facts, not supporting denial with record citation]; Dkt. No. 33, Attach. 25, at 85 [attaching page "86" of Plf.'s Depo. Tr., establishing fact asserted above].)

would have been able to view the call remarks on his computer screen in his police car.

Approximately 10 to 15 minutes after Plaintiff placed the call, Defendant Officers arrived at her apartment, as requested by her. At the time, Defendant Farrand had been employed with the Schenectady Police Department for more than 12 years, while Defendant Giardono had been so employed for approximately 16 years. Defendant Farrand was the first to arrive at 266 State Street, followed shortly by Defendant Giardono. When Defendant Giardono exited his police car, he saw Ms. Fountain standing on the sidewalk with a male (who was her brother, Kerry Fountain) and said, "Jesus Christ."[15]

Defendant Farrand knew Ms. Fountain because he had been previously introduced to her by their mutual friend, Dana Livingston, at a bar before the events of June 4, 2012, and Defendant Farrand recognized Ms. Fountain. At some point before June 4, 2012, Ms. Fountain stopped talking to Ms. Livingston.[16] (Defendant Farrand did not tell Defendant Giardono that he was acquainted with Ms. Fountain until later, when they were in the muster room at the police station.)

Upon arriving at the scene, Defendant Officers approached Ms. Fountain on the sidewalk outside of the apartment. Ms. Fountain recognized Defendant Ferrand, although she did not acknowledge that fact.[17] Defendant Officers spoke with Ms. Fountain about the incident involving her and Plaintiff. At that time, while still outside of the apartment, Ms. Fountain told

---

[15]     (Dkt. No. 33, Attach. 23, at 43-44 [attaching pages "43" and "44" of Giardono's Depo. Tr.]; Dkt. No. 31, at "13:30:20" [Defs.' Ex. S, containing video recording on June 4, 2012].)

[16]     (Dkt. No. 33, Attach. 26, at 160 [attaching page "160" of Fountain's Depo. Tr.].)

[17]     (Dkt. No. 33, Attach. 26, at 158 [Fountain's Depo. Tr.].)

Defendant Officers that she had been residing with Plaintiff for an extended period of time,[18] and

that Plaintiff had grabbed her arm and pulled her away (twisting her arm) as items were being

removed from the apartment.[19]  She then asked that Plaintiff be placed under arrest.[20]  To Ms.

Fountain's brother Kerry, Defendant Officers "seemed friendly toward [her] and disposed toward

arresting [Plaintiff]."[21]  Defendant Officers had not observed the prior incident between Plaintiff

and Ms. Fountain at the dresser.

    Defendant Officers and Ms. Fountain walked upstairs to the apartment.  When Defendant

Officers arrived at the apartment, Ms. Fountain let them into the apartment.  After Defendant

Officers were in the apartment, Plaintiff asked them what her rights were with regard to the

clothing that she had gifted to Ms. Fountain.  Defendant Officers responded that, because the

clothing had been a gift, it belonged to Ms. Fountain.  After this conversation about the clothing,

Plaintiff told Defendant Giardono, "I just want her out of here."  At that point, one or both of

---

[18]    (Dkt. No. 33, Attach. 3, at ¶ 46 [Plf.'s Rule 7.1 Response, not supporting denial of fact with citations to record evidence regarding what Ms. Fountain told Defendant Officers, but supporting that denial with citations to record evidence regarding how long Ms. Fountain had stayed with Plaintiff]; Dkt. No. 24, Attach. 20, at 4 [Defs.' Answer to Interrogatory No. 3, stating that, while outside 266 State Street, "[i]n sum or substance, . . . Colleen Fountain advised [Defendant Officers] that she had been living with plaintiff Regels, her mother, for an extended period of time."]; *cf.* Dkt. No. 33, Attach. 26, at 40 [Fountain's Depo. Tr., stating that on June 3, 2012, two others officers learned from Plaintiff that Ms. Fountain had living in the apartment "[f]or . . . over a month"].)

[19]    (Dkt. No. 33, Attach. 3, at ¶ 46 [Plf.'s Rule 7.1 Response, admitting fact]; Dkt. No. 33, Attach. 2, at ¶ 80 [Plf.'s Rule 7.1 Statement, asserting part of fact].)

[20]    (Dkt. No. 33, Attach. 3, at ¶ 46 [Plf.'s Rule 7.1 Response, admitting fact]; Dkt. No. 33, Attach. 2, at ¶ 82 [Plf.'s Rule 7.1 Statement, asserting part of fact].)

[21]    (Dkt. No. 33, Attach. 5, at ¶ 15 [Kerry Fountain Affid.].)

Defendant Officers may have stepped into an "interior hallway."[22]  (The "interior hallway" was located between the front door of Plaintiff's apartment and a door to the stairway to the ground floor; no other apartments were located on the floor on which Plaintiff's apartment and the "interior hallway" was located.)[23]  Plaintiff went to her bedroom.[24]  When Ms. Fountain's brother Kerry was leaving the apartment, he closed the front door of the apartment behind him.[25]

Defendant Giardono asked Ms. Fountain, "So you're willing to come down to the police station and sit there and sign all the charges?"[26]  Ms. Fountain responded in the affirmative.[27]  Shortly thereafter, Defendant Giardono said, "Hey, Mike" (referring to Defendant Farrand), and the two Defendant Officers began a conversation regarding a complainant's verbal request to place a suspect under arrest on a violation charge.[28]  Defendant Giardono informed Ms. Fountain that, if she wanted Plaintiff arrested, Ms. Fountain had to advise Plaintiff that she desired her to

---

[22]     (*Compare* Dkt. No. 33, Attach. 25, at 78-80 [attaching pages "79" through "81" of Plf.'s Depo. Tr.] *with* Dkt. No. 33, Attach. 5, at ¶ 21 [Kerry Fountain Affid.] *and* Dkt. No. 33, Attach. 23, at 50-51 [attaching pages "51" and "52" of Farrand's Depo. Tr.] *and* Dkt. No. 33, Attach. 23, at 77 [attaching page "78" of Giardono's Depo. Tr.] *and* Dkt. No. 33, Attach. 26, at 106-09 [attaching pages "106" through "109" of Fountain's Depo. Tr.].)

[23]     (Dkt. No. 33, Attach. 5, at ¶ 19 [Kerry Fountain Affid.].)

[24]     (Dkt. No. 33, Attach. 25, at 79 [attaching page "80" of Plf.'s Depo. Tr.].)

[25]     (Dkt. No. 33, Attach. 5, at ¶ 20 [Kerry Fountain Affid.].)

[26]     (Dkt. No. 31, at "13:34:08" [Defs.' Ex. S, containing video recording on June 4, 2012].)

[27]     (Dkt. No. 31, at "13:34:11" [Defs.' Ex. S, containing video recording on June 4, 2012; Dkt. No. 33, Attach. 23, at 60 [attaching page "61" of Giardono's Depo. Tr.])

[28]     (Dkt. No. 31, at "13:34:25" to "13:34:50" [Defs.' Ex. S, containing video recording on June 4, 2012]; Dkt. No. 40, Attach. 1, at ¶ 104-05 [Defs.' Rule 7.1 Response].)

be placed under arrest.[29]

At some point, Plaintiff (who was still in her bedroom and believed Defendant Officers had left her apartment) realized that Defendant Officers were in her apartment.[30] Plaintiff came out of her bedroom.[31] In Defendant Officers' presence, Ms. Fountain stated that she wanted Plaintiff arrested for grabbing her arm and for attempting to push her off of the dresser.[32] Ms. Fountain did not place Plaintiff under arrest but requested that she be placed under arrest. Ms. Fountain was not forced or otherwise compelled to request that Defendant Officers arrest Plaintiff; she did not tell them that she did *not* wish Plaintiff to be arrested. While Defendant Officers were inside of her apartment, Plaintiff did not deny having grabbed Ms. Fountain's arm and in fact admitted having done so.

Defendant Officers informed Plaintiff that Ms. Fountain wanted her to be arrested. Defendant Giardono advised Plaintiff that she was being placed under arrest on the charge of

---

[29]    (Dkt. No. 33, Attach. 26, at 79 [attaching page "79" of Fountain's Depo. Tr.]; Dkt. No. 33, Attach. 24, at 53, 79 [attaching pages "54" and "79" of Def. Farrand's Depo. Tr.]; *cf.* Dkt. No. 33, Attach. 2, at ¶ 141 [Plf.'s Rule 7.1 Statement, asserting fact, although not supporting assertion with accurate record citation].)

[30]    (Dkt. No. 33, Attach. 25, at 79-83 [attaching pages "80" through "84" of Plf.'s Depo. Tr.].)

[31]    (Dkt. No. 33, Attach. 25, at 83 [attaching page "84" of Plf.'s Depo. Tr.].)

[32]    (Dkt. No. 33, Attach. 26, at 101-02 [Fountain's Depo. Tr.]; Dkt. No. 33, Attach. 23, at 58, 80 [attaching pages "59" and "81" of Giardono's Depo. Tr.]; Dkt. No. 33, Attach. 24, at 53, 79 [attaching pages "54" and "79" of Def. Farrand's Depo. Tr.]; Dkt. No. 33, Attach. 3, ¶ 50 [Plf.'s Rule 7.1 Response, stating that, inside the apartment, "Colleen Fountain stated words to the effect that she wanted her mother arrested to the police officers . . ."], *accord,* Dkt. No. 33, Attach. 2, at ¶ 142 [Plf.'s Rule 7.1 Statement].)

Harassment. Plaintiff asked Defendant Officers, "[H]ow did you get in my apartment?"[33] One of Defendant Officers responded, "Your daughter . . . let us in."[34] Plaintiff said, "[S]he doesn't live here."[35] Plaintiff then asked Defendant Officers for a warrant to be in her apartment.[36] Defendant Officers responded, "We don't need one."[37] Plaintiff told Defendant Officers "goodbye" and that they could leave now; she then went into her bedroom and tried to close the door on them.[38] As she did so, she started yelling.[39]

Defendant Officers followed Plaintiff into the bedroom for the purpose of placing her under arrest. When Defendant Officers came into Plaintiff's bedroom, one or both of them may have said, "You're going to jail."[40] One or both of them may have also thrown Plaintiff onto her

---

[33]     (Dkt. No. 33, Attach. 25, at 84 [attaching page "85" of Plf.'s Depo. Tr.].)

[34]     (Dkt. No. 33, Attach. 25, at 84 [attaching page "85" of Plf.'s Depo. Tr.].)

[35]     (Dkt. No. 33, Attach. 25, at 84 [attaching page "85" of Plf.'s Depo. Tr.].)

[36]     (Dkt. No. 33, Attach. 25, at 84 [attaching page "85" of Plf.'s Depo. Tr.].)

[37]     (Dkt. No. 33, Attach. 25, at 86 [attaching page "87" of Plf.'s Depo. Tr.].)

[38]     (Dkt. No. 33, Attach. 3, at ¶ 54 [Plf.'s Rule 7.1 Response, admitting facts asserted above], accord, Dkt. No. 33, Attach. 2, at ¶ 148 [Plf.'s Rule 7.1 Statement]; Dkt. No. 33, Attach. 25, at 88 [attaching page "89" of Plf.'s Depo. Tr.]; Dkt. No. 33, Attach. 23, at 75, 76, 78, 81, 82 [attaching pages "76," "77," "79," "82," and "83" of Giardono's Depo. Tr.]; Dkt. No. 33, Attach. 24, at 52, 63-64 [attaching pages "53," "64" and "65" of Farrand's Depo. Tr.]; Dkt. No. 33, Attach. 20 [Ferrand's Criminal Information]; Dkt. No. 24, Attach. 15, at 2 [Ferrand's Use of Force Report]; Dkt. No. 24, Attach. 16, at 2 [Giardono's Use of Force Report]; Dkt. No. 24, Attach. 11, at 1 [Domestic Incident Report].)

[39]     (*Compare* Dkt. No. 24, Attach. 24, at ¶ 54 [Defs.' Rule 7.1 Statement, asserting fact and supporting it with accurate record citations] *with* Dkt. No. 33, Attach. 3, at ¶ 54 [Plf.'s Rule 7.1 Response, denying fact but not supporting denial with accurate record citation]; *see also* Dkt. No. 31, at "13:35:22" [Defs.' Ex. S, containing video recording on June 4, 2012].)

[40]     (Dkt. No. 33, Attach. 25, at 93 [Plf.'s Depo. Tr.].)

bed, crisscrossed her legs and held them.[41] At some point, Defendant Giardono told Plaintiff to

place her hands behind her back.[42]  In an effort to compel her to place her hands behind her back,

Defendant Officers grabbed the arms of Plaintiff, who was facedown on the bed.[43]  As Defendant

Giardono was attempting to place Plaintiff's hands behind her back, she managed to pull her

wrist free from his grasp.[44]  At some point, one or both of Defendant Officers bent one of

---

[41]        (*Compare* Dkt. No. 33, Attach. 25, at 89-91 [attaching pages "89" to "91" of Plf.'s Depo. Tr.] *with* Dkt. No. 24, Attach. 13, at 16, 17, 19 [attaching pages "84," "85" and "88" of Giardono's Depo. Tr.] *and* Dkt. No. 33, Attach. 24, at 65-66 [attaching pages "66" and "67" of Farrand's Depo. Tr.] *and* Dkt. No. 24, Attach. 15 [Ferrand's Use of Force Report, stating, *inter alia*, "Subject also kicked at us after hopping on her bed"] and Dkt. No. 24, Attach. 16 [Giardono's Use of Force Report, stating, *inter alia*, "Subject then jumped on bed and started to push and kick at both officers"].)

[42]        (Dkt. No. 33, Attach. 24, at 67 [attaching page "68" of Farrand's Depo. Tr.]; Dkt. No. 24, Attach. 13, at 18-19 [attaching pages "87" and "88" of Giardono's Depo. Tr.]; Dkt. No. 24, Attach. 14 [Ferrand's Statement]; Dkt. No. 24, Attach. 15, at 2 [Ferrand's Use of Force Report]; Dkt. No. 33, Attach. 3, at ¶ 56 [Plf.'s Rule 7.1 Response, denying fact but supporting denial with citation to page "92" of her deposition transcript, wherein she responded, "I don't recall" to the question, "*At any point* were you directed to put your hands behind your back"] [emphasis added].)  The Court notes that "a non-movant cannot create a genuine dispute of material fact by merely denying knowledge of that fact." *Binghamton-Johnson City Joint Sewage Bd v. Am. Alternative Ins. Corp.*, 12-CV-0553, 2014 WL 4715618, at *4, n.2 (N.D.N.Y. Sept. 22, 2014) (Suddaby, J.) (citing cases).

[43]        (Dkt. No. 33, Attach. 24, at 65-67 [attaching pages "66" through "68" of Farrand's Depo. Tr.]; Dkt. No. 24, Attach. 13, at 18-19 [attaching pages "87" and "88" of Giardono's Depo. Tr.]; Dkt. No. 24, Attach. 15, at 2 [Ferrand's Use of Force Report]; Dkt. No. 24, Attach. 16, at 2 [Giardono's Use of Force Report]; Dkt. No. 33, Attach. 3, at ¶ 56 [Plf.'s Rule 7.1 Response, failing to deny fact asserted above]; Dkt. No. 33, Attach. 25, at 92-93 [Plf.'s Depo. Tr., stating that, although she could not recall if "[a]t any point [she was] directed to put [her] hands behind [her] back," she did recall that "the shorter [officer]" "took . . . [her] arm" as she lay facedown half on the bed and half on the floor].)

[44]        (Dkt. No. 24, Attach. 13, at 21 [attaching page "90" of Giardono's Depo. Tr.]; Dkt. No. 24, Attach. 15, at 2 [Ferrand's Use of Force Report]; Dkt. No. 24, Attach. 11, at 1 [Domestic Incident Report]; Dkt. No. 33, Attach. 3, at ¶ 57 [Plf.'s Rule 7.1 Response, failing to support denial with a record citation].)

Plaintiff's arms behind her back.[45]  In addition, one or both of Defendant Officers may have held

one of Plaintiff's arms down with his knee.[46]  Defendant Giardono was able to grab Plaintiff's

wrist and put it behind her back in order to handcuff her; and Defendant Farrand was able to put

handcuffs on Plaintiff.  The struggle to put Plaintiff in handcuffs did not last very long.

   One or both Defendant Officers stood her up by lifting her arms.[47]  Defendant Giardono

told Plaintiff, "[P]ut your shoes on; let's go or you are going barefoot."  Defendant Officers

walked Plaintiff down the hallway and downstairs to a police vehicle, dragging the tops of her

feet when she did not keep pace.[48]  As they were doing so, Defendant Farrand told Plaintiff (who

was in her pajamas and bathrobe), "[I]t's a little late to worry about your appearance."  Once

Plaintiff reached the police cars, someone handed her a pair of slippers.

###### 5.     Events of June 4, 2012–After Arrival at Police Department

   Plaintiff was transported from her apartment to the Schenectady Police Department.  She

was brought inside and was taken back to speak with a female correction officer.  The female

---

[45]     (*Compare* Dkt. No. 33, Attach. 25, at 90, 93 [Plf.'s Depo. Tr., characterizing act as "twisting"] with Dkt. No. 33, Attach. 24, at 66-68 [attaching pages "67" through "69" of Farrand's Depo. Tr., characterizing act "get[ting] her hands behind her back"].)

[46]     (*Compare* Dkt. No. 33, Attach. 25, at 92-93 [Plf.'s Depo. Tr., stating that, at some point, the shorter of the two officers "kneed [Plaintiff] in [her] back like holding [her] arm down," "like he was holding [her] arm with his knee"] *with* Dkt. No. 33, Attach. 23, at 87 [attaching page "91" of Giardono's Depo. Tr., denying that he "put his knee [on] [Plaintiff's] *back* in order to cuff her"] [emphasis added] *and* Dkt. No. 33, Attach. 24, at 69 [attaching page "70" of Farrand's Depo. Tr., not recalling if Officer Giardono put his knee on Plaintiff's *back* in order to her handcuff her].)

[47]     (Dkt. No. 33, Attach. 25, at 94 [Plf.'s Depo. Tr.]; Dkt. No. 33, Attach. 24, at 69-70 [attaching pages "70" and "71" of Farrand's Depo. Tr.].)

[48]     (Dkt. No. 33, Attach. 25, at 94, 95, 97 [Plf.'s Depo. Tr.]; Dkt. No. 33, Attach. 24, at 69-70 [attaching pages "70" and "71" of Farrand's Depo. Tr.].)

correction officer asked Plaintiff how she had gotten all the marks on her arms; and Plaintiff responded that the marks on her arm were from the police officers lifting her up and dragging her out of her apartment. After Plaintiff told the correction officer how many beers she had consumed and that she had taken Benadryl to control her allergies, the correction officer told Plaintiff that she would "be a good one tonight; you'll be asleep." The correction officer warned her about the "night correction officer," telling her to keep her mouth shut and "[D]on't ask for nothing."[49]

During Plaintiff's booking, Ms. Fountain appeared at the Schenectady Police Department for the purpose of executing certain documents charging Plaintiff in connection with the incident that had occurred at the apartment. She was met by one of the two Defendant Officers.

On one occasion during that meeting, Ms. Fountain may have said to the Defendant Officer, "If I wanted to[,] could I have the charges dropped?"[50] The Defendant Officer (who apparently was Defendant Giardono) did not interpret this question (if it was asked of him) as either a statement that she wanted to drop the charges or a request to drop the charges.[51] A heavy female officer appeared and stated that it was too late for Ms. Fountain to drop the charges because Plaintiff had already been charged with resisting arrest.[52]

---

[49]     (Dkt. No. 33, Attach. 25, at 123 [attaching page "124" of Plf.'s Depo. Tr.].)

[50]     (Dkt. No. 33, Attach. 26, at 131, 141-42 [attaching pages "131" and "141" of Fountain's Depo. Tr.].)

[51]     (Dkt. No. 33, Attach. 23, at 106-107 [attaching pages "110" and "111" of Giardono's Depo. Tr.].)

[52]     (Dkt. No. 33, Attach. 26, at 131-32 [attaching pages "131" and "132" of Fountain's Depo. Tr.]; Dkt. No. 33, Attach. 25, at 124 [attaching page "125" of Plf.'s Depo. Tr.].)

Ms. Fountain signed a statement charging Plaintiff with Harassment in the Second

Degree, and stating, in pertinent part, as follows:

> On [June 4, 2012] . . . [Plaintiff] did intentionally, knowingly and unlawfully commit the offense of Harassment in the Second Degree when she did grab deponent around the right arm and forcefully pull on it. Said actions by [Plaintiff] did cause the deponent annoyance and alarm. The deponent did have noticeable redness around the arm.[53]

Ms. Fountain also executed a Domestic Incident Report, which stated, in pertinent part, as

follows:

> [Plaintiff] grabbed her arm and squeezed it trying to remove her. [Plaintiff] did resist officers when she was advised she was going to be arrested. [Plaintiff] did slam the door shut while officer was in doorway. [Plaintiff] then jumped on the bed and kicked and pushed officers. [Plaintiff] also refused to place her hands behind her back.

Ms. Fountain also signed a Supporting Deposition, which complained that Plaintiff "grabbed

[her] right arm and pulled it," to the point of inflicting pain and causing redness.  When Ms.

Fountain executed the three above-referenced documents, she understood that she was

complaining that Plaintiff had harassed her.

Officer Farrand executed a Criminal Information charging Plaintiff with the misdemeanor

of Resisting Arrest, which alleged as follows, in pertinent part:

---

[53]     (*Compare* Dkt. No. 33, Attach. 26, at 126-27 [Fountain's Depo. Tr.] and Dkt. No. 24, Attach. 10 [Fountain's Statement] *with* Dkt. No. 33, Attach. 3, at ¶ 65 [Plf.'s Rule 7.1 Response, denying fact but supporting denial with only citation to pages 133 and 134 of Ms. Fountain's deposition transcript, in which states she does not recall having read before a portion of a separate document (which is insufficient to create a genuine dispute of fact), and she states she was told before signing the statement that it was too late for her to drop the charges because Plaintiff had already incurred another charge (which does not actually controvert the fact asserted)].)

[Plaintiff] attempted to close a bedroom door on the deponent after she was instructed she was under arrest. [Plaintiff] also did refuse to comply [with] verbal commands to place her hands behind her back and flailed her arms in an attempt to get away. [Plaintiff] was taken into custody after a brief struggle.

### 6. Events of June 5, 2012

Eventually on June 4, 2012, Plaintiff was placed in a holding cell at the Schenectady Police Department. The cell contained a toilet and a cot against the wall (which was the only furniture on which to lie). The cot or bench was constructed of wood and was approximately two feet wide and five feet long. The holding cell wall was constructed of steel. The gap between the cot and the cell wall was approximately three to four inches wide. The bench was supported by two steel angle brackets, so no posts or legs connected it to the floor.

Plaintiff lay down on the cot and fell asleep for probably five or six hours. She awoke and realized that her left arm was stuck between the cot and the wall. She yelled for the correction officer. The correction officer came in the cell and tried to give assistance, but was unable to help. Several officers who were in the holding area came and tried to help, but they were also unable to remove Plaintiff's arm from between the wall of the cell and the cot.

At 2:05 a.m., a dispatch call was made that requested Schenectady Fire Department assistance in order to extract Plaintiff from between the cot and the cell. The Schenectady Fire Department responded for extrication/rescue and arrived on scene at 2:15 a.m. When the Fire Department arrived, a lieutenant and three other firemen were taken to the cell by a Schenectady Police Department matron in order to extract Plaintiff.

The lieutenant and three other fireman discussed what tools they were going to need and this included the "jaws of life." The first tool they tried was a "pry bar" (which is similar to a

large crow bar), but with it they were unable to move the wall or bench. They loosened the nuts

of two bolts that held the cot to the wall, which was enough to move it. After the bolts had been

loosened, one of the matrons at the Schenectady Police Department had hand lotion, which was

applied to Plaintiff's arm. At 2:34 a.m., Plaintiff was able to free her arm.

After her arm was freed, she was asked if she want to go to the hospital, and she said no.

She was released from custody on June 5, 2012.

The sole basis of Plaintiff's negligence cause of action as against Defendant City of

Schenectady stems from the City's alleged maintenance of a dangerous condition on June 5,

2012, within the holding cell where she was being held.

### 7.      Events of June 6, 2012

On June 6, 2012, the day following Plaintiff's release from custody, she again contacted

Schenectady Police Department to advise them that Ms. Fountain was verbally harassing her.

Plaintiff did not request police assistance when she called the Schenectady Police Department on

June 6, 2012; she simply wished to advise them that Ms. Fountain was calling her home.

### 8.      Events of June 13, 2012

Eventually, Plaintiff presented to Ellis Hospital on June 13, 2012, with regard to her arm

injury. Plaintiff's medical records from Ellis Hospital reflect that, at that time, she complained of

left arm pain which she had been experiencing for approximately one week. Plaintiff's medical

records further reflect that her left-arm complaint was due to her arm being pinned between a

wall and a board, resulting in left elbow pain and swelling. Plaintiff's medical records are devoid

of any reference by her that she sustained an injury as a result of her arrest of June 4, 2012, or as

a result of conduct on the part of Defendant Officers.[54]

At Ellis Hospital, she underwent a "three view x-ray" of her left arm and was subsequently told that "[the x-ray] was all right."[55] The x-ray revealed no fracture, no dislocation and no significant bone or soft tissue abnormality. The clinical impression observed by the physician's assistant indicated a "[c]ontusion" on Plaintiff's left elbow. She was told to take Motrin/Tylenol as needed for the treatment of pain.

Plaintiff presented to the hospital on only this one occasion with regard to her arm.

At approximately this time, Plaintiff was treated by her primary care physician, Dr. Hughes, on one occasion with regard to her arm; he did not provide a prescription, refer her to physical therapy, or make any recommendations as to further treatment. Other than receiving treatment at Ellis Hospital on one occasion and treatment from Dr. Hughes on one occasion, Plaintiff received no further medical treatment with regard to the claims set forth in her Amended Complaint. Plaintiff did not receive any mental or emotional health treatment related to the subject incidents. As a result of the incidents alleged in the Amended Complaint, Plaintiff did not incur any out-of-pocket expenses, and she was not caused to miss any work.

_____

[54]    (Compare Dkt. No. 24, Attach. 8-9 [containing Plaintiff's medical records] with Dkt. No. 33, Attach. 3, at ¶ 78 [Plf.'s Rule 7.1 Response, failing to support denial with a record citation].)

[55]    (Dkt. No. 33, Attach. 25, at 135-37 [attaching pages "136" through "138" of Plf.'s Depo. Tr.].)

### 9. Plaintiff's Criminal Proceeding

On August 13, 2012, Plaintiff's defense counsel filed a motion to dismiss the Resisting

Arrest charge against her on the ground that the charge "is not sufficient on its face."[56]  On

September 25, 2012, City Court Judge Mark W. Blanchfield granted that motion.[57]  The express

ground for the granting of the motion was "[f]acial [i]nsufficiency."[58]  Judge Blanchfield's stated

that his reason for finding the charge to be facially insufficient was that the arrest for Harassment

in the Second Degree "was not in compliance with the criminal procedure law" in that the

harassment had not occurred "in [the] officers' presence."[59]

On January 30, 2013, Plaintiff proceeded to trial in Schenectady City Court regarding the

charge of Harassment in the Second Degree.  On February 4, 2013, after a bench trial, Judge

Blanchfield acquitted Plaintiff, because the prosecution had not proved beyond a reasonable

doubt that she possessed the "appropriate [level] of intent" when she had physical contact with

---

[56]     (Dkt. No. 24, Attach. 19, at 1, 4 [containing affidavit-brief dated Aug. 13, 2012, requesting dismissal of Resisting Arrest charge, because it "is not sufficient on its face"]; Dkt. No. 33, Attach. 2, at ¶ 234 [Plf.'s Rule 7.1 Statement, asserting fact].)

[57]     (Dkt. No. 24, Attach. 17, at 2 [containing Decision and Order dated Sept. 25, 2012, granting motion to dismiss]; Dkt. No. 33, Attach. 29, at 1 [Motion to Reargue]; Dkt. No. 24, Attach. 17, at 1 [containing Certificate of Disposition dated Feb. 4, 2013, memorializing prior dismissal]; Dkt. No. 33, Attach. 22, at 100 [attaching page "90" of trial transcript, noting that "the resisting arrest charge had [previously] been dismissed . . ."]; Dkt. No. 33, Attach. 2, at ¶ 234 [Plf.'s Rule 7.1 Statement, asserting fact].)

[58]     (Dkt. No. 24, Attach. 17, at 2 [containing Decision and Order dated Sept. 25, 2012, granting motion to dismiss because of "Facial Insufficiency"].)

[59]     (Dkt. No. 24, Attach. 17, at 2 [containing Decision and Order dated Sept. 25, 2012, stating, "Not in officers' presence, so not authorized arrest of H2d.  Charges of R.A. dismissed."]; Dkt. No. 33, Attach. 22, at 100 [attaching page "90" of trial transcript, noting that "the Court . . . has already found that arrest for this violation was not in compliance with the criminal procedure law and for that reason the resisting arrest charge had been dismissed . . ."].)

Ms. Fountain.[60]  However, before rendering that ruling, Judge Blanchfield found, in pertinent

part, as follows:

> [E]ven though the event did not occur in the officer's presence, it's–a
> warrant would have been issued for the arrest if the proper procedure had
> been files [sic].  So, the Court does find that probable cause exists for the
> arrest.[61]

**10.      Schenectady Police Department's General Order 0-36**

On May 24, 2012, the Schenectady Police Department issued General Order 0-36,

entitled "Domestic Incidents."

Section II.E. of that General Order states as follows, in pertinent part: "It is the policy of

this Department that members will: . . . [i]nvestigate all domestic incidents for evidence of

criminal behavior in order to arrest offenders on appropriate criminal charges. . . ."[62]

Section IV.B.3.g. of that General Order states as follows:

> The responding on-scene officers shall: . . . [a]fter all interviews have been
> conducted, determine whether an offense has been committed, whether an
> arrest should be made, and whether other action should be taken. If an
> arrest is made at the scene, advise the victim that release of the suspect can
> occur at any time so that the victim can take desired safety precautions.[63]

Section IV.C.1. of that General Order states as follows: "All warrantless arrests shall be

made in conformance with Section 140.10 of the Criminal Procedure Law and applicable

---

[60]      (Dkt. No. 33, Attach. 22, at 101 [attaching page "91" of trial transcript].)

[61]      (Dkt. No. 33, Attach. 22, at 100 [attaching page "90" of trial transcript].)

[62]      (Dkt. No. 24, Attach. 23, at 1.)

[63]      (Dkt. No. 24, Attach. 23, at 7-8.)

Department Policies and Procedure."[64]

Section IV.C.8. of that General Order states as follows:

> Civilian Arrest: If the complainant states a desire to arrest an offender for a violation not occurring in the officer's presence, and a willingness to come to the police station to sign an accusatory instrument, and inform the offender of his/her intention to effect a citizen's arrest either verbally or by signing a domestic incident report so stating which is duly served upon the offender, unless such notice is impractical because the offender is offering physical resistance, the officer shall facilitate that arrest by taking the offender into custody and arranging for the complainant to go to the police station to complete the necessary paperwork.[65]

Section IV.I.1. of that General Order states as follows:

> Arrest: there will be no Appearance Tickets issued to persons arrested as a result of any domestic incident, including violations of orders of protection. All such persons shall be taken into custody, transported to police headquarters, booked at the desk, fingerprinted and photographed.[66]

## C.    Briefing on Parties' Motions for Summary Judgment

### 1.    Defendants' Motion for Summary Judgment

Generally, in support of their motion for summary judgment, Defendants assert the following eight arguments. (*See generally* Dkt. No. 24, Attach. 25 [Defs.' Memo. of Law].)

First, argue Defendants, Plaintiff's first claim (for invasion of privacy and illegal search under the Fourth Amendment) must be dismissed for the following reasons: (a) her Amended Complaint alleges no facts plausibly suggesting that any search whatsoever occurred; (b) with regard to her claim of an invasion of privacy, she gave Defendant Officers express and/or implied

---

[64]    (Dkt. No. 24, Attach. 23, at 10.)

[65]    (Dkt. No. 24, Attach. 23, at 14.)

[66]    (Dkt. No. 24, Attach. 23, at 20.)

consent to enter her apartment on June 4, 2012, when she called and requested police presence that day; and (c) in any event, Ms. Fountain, who had both access to the apartment and a substantial interest in that apartment (or, at the very least, apparent common authority over the apartment), gave Defendant Officers valid, third-party consent to enter the apartment when she let them into it.  (*Id.* at 5-10 [attaching pages "2" through "7" of Defs.' Memo. of Law].)

Second, argue Defendants, Plaintiff's second claim (for illegal detention under the Fourth Amendment) must be dismissed for the following reasons: (a) Defendant officers had probable cause to arrest her for Harassment in the Second Degree under N.Y. Penal Law § 240.26 (which proscribes, *inter alia*, the subjection of another person to physical contact with the intent to harass, annoy or alarm that person) based only on the information given by Ms. Fountain and Plaintiff herself; (b) indeed, Judge Blanchfield ruled that probable cause existed for Plaintiff's arrest for Harassment in the Second Degree; and (c) even if Plaintiff's arrest was impermissible under N.Y. Crim. Proc. Law § 140.10(1) (which permits a police officer to arrest a person for an offense only where he or she has reasonable cause to believe that such person has committed such offense *in his or her presence*), the arrest does not violate the Fourth Amendment, as previously recognized by cases issued by this District.  (*Id.* at 10-15 [attaching pages "7" through "10" of Defs.' Memo. of Law].)

Third, argue Defendants, Plaintiff's third, fifth and ninth claims (for false arrest, assault and battery, and negligence), which are all based on state law, must be dismissed because she failed to serve a timely notice of claim upon Defendants within ninety days after the claims arose, as required by N.Y. Gen. Mun. Law § 50-e (which provides that, "[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of

an action . . . against . . . any officer, appointee or employee [of a public corporation], the notice of claim shall . . . be served . . . within ninety days after the claim arises . . .").  (*Id.* at 15-16 [attaching pages "12" and "13" of Defs.' Memo. of Law].)

Fourth, argue Defendants, Plaintiff's fourth claim (for excessive force under the Fourth Amendment) must be dismissed for the following reasons: (a) such claims are governed by a standard of "objective unreasonableness," pursuant to which an officer's underlying intent or motivation in applying the use of force has no bearing, and pursuant to which a "de minimis" use of force (of which a de minimis injury can serve as conclusive evidence) will rarely suffice to establish a claim; and (b) here, even assuming Plaintiff's account of Defendant Officers' use of force was accurate (i.e., their throwing her down on her bed, crisscrossing and holding her legs, twisting her left arm, using a knee to hold her hand and arm in place, bringing her to an upright position, and dragging her downstairs in that upright position), such force was undisputably de minimis in nature (as evidenced by the fact that she did not sustain any discernible injury that can be categorized as greater than "minor" as a result of such force).  (*Id.* at 16-19 [attaching pages "13" through "16" of Defs.' Memo. of Law].)

Fifth, argue Defendants, Plaintiff's sixth and seventh claims (for malicious prosecution under the Fourth Amendment and state law) must be dismissed for the following reasons: (a) among the elements that a plaintiff must prove to succeed on such a claim are that the defendant lacked probable cause to believe the proceeding could succeed, that the defendant acted with malice, and that the prosecution was terminated in the plaintiffs favor; (b) here, regarding the charge of Resisting Arrest, Defendant Officers had probable cause to believe that the proceeding on the Harassment charge could succeed (and thus it is unnecessary to determine whether

probable cause existed to believe that the proceeding on the Resisting Arrest charge could succeed), and in any event the prosecution did not terminate in Plaintiff's favor (because a dismissal of a criminal case on a finding that an accusatory instrument is facially insufficient is deemed a dismissal without prejudice to proceed on an amended accusatory instrument and is not a reflection of innocence); and (c) regarding Harassment in the Second Degree, Defendant Officers had probable cause to believe that the proceeding on the Harassment charge could succeed, and Plaintiff has adduced no admissible record evidence demonstrating or tending to demonstrate that Defendant Officers acted with improper motive (i.e., malice) in the prosecution of the Harassment charge. (*Id.* at 19-22 [attaching pages "16" through "19" of Defs.' Memo. of Law].)

Sixth, argue Defendants, Plaintiff's eighth claim (for municipal liability arising from a policy mandating that police officers make an arrest when responding to a call alleging domestic violence) fails to demonstrate that Defendant City maintained an unconstitutional custom or policy that proximately caused the alleged constitutional violations for the following reasons: (a) General Order 0-36 did not require police to make arrests when responding to all domestic incidents even if the offense occurred outside of their presence, as evident from Sections IV.B.3.g. and IV.C.8. of that General Order; (b) even if General Order 0-36 did so require, it is not unconstitutional because a Fourth Amendment violation may not be based on any failure to comply with N.Y. Crim. Proc. Law § 140.10 (given that the Fourth Amendment does not require the officer to witness the offense); and (c) furthermore, even if the General Order 0-36 were unconstitutional, Plaintiff has adduced proof of only a single incident of constitutional activity (and proof of a single incident of unconstitutional activity is not sufficient to impose municipal

liability).  (*Id.* at 22-24 [attaching pages "19" through "21" of Defs.' Memo. of Law].)

Seventh, argue Defendants, Plaintiff's request for punitive damages from Defendant City and Defendant Officers in their official capacities must be dismissed because such damages are not recoverable against a municipality with regard to claims arising under either 42 U.S.C. § 1983 or state law.  (*Id.* at 25 [attaching page "22" of Defs.' Memo. of Law].)

Eighth, argue Defendants, Plaintiff's first, second, third and fourth claims (for invasion of privacy and illegal search under the Fourth Amendment, illegal detention under the Fourth Amendment, false arrest under state law, and excessive force under the Fourth Amendment) must be dismissed because, based on the current record, Defendant Officers are protected from liability on those claims as a matter of law for the following reasons: (1) regarding Plaintiff's first claim (for invasion of privacy and illegal search under the Fourth Amendment), it was objectively reasonable for Defendant Officers to believe that their acts did not violate Plaintiff's constitutional rights because their presence was requested by Plaintiff at her apartment, and in any event they reasonably relied on Ms. Fountain's third-party consent to enter the apartment; (2) regarding Plaintiff's second and third claims (for illegal detention under the Fourth Amendment and false arrest under state law), it was objectively reasonable for Defendant Officers to believe that their acts did not violate Plaintiff's constitutional rights because Ms. Fountain advised them that Plaintiff had initiated physical contact with her in an effort to pull her down from her own dresser, which was confirmed and acknowledged by Plaintiff herself; and (3) regarding Plaintiff's fourth claim (for excessive force under the Fourth Amendment), it was objectively reasonable for Defendant Officers to believe that their acts did not violate Plaintiff's constitutional rights because she resisted arrest (in that, after being advised she was under arrest, she retreated to her

bedroom, tried to shut the door on Defendant Officers, and pulled her wrist free from Defendant

Giardono's grasp). (*Id.* at 25-28 [attaching pages "22" through "25" of Defs.' Memo. of Law].)

### 2. Plaintiff's Response and Cross-Motion for Summary Judgment

Generally, in response to Defendants' motion for summary judgment, and in support of

her own cross-motion for summary judgment, Plaintiff asserts the following eight arguments.

(*See generally* Dkt. No. 39 [Plf.'s Memo. of Law].)

In response to Defendants' first argument (regarding Plaintiff's claim for invasion of

privacy and illegal search under the Fourth Amendment), Plaintiff argues that she has established

that Defendant Officers violated her Fourth Amendment right to privacy and to be secure against

unauthorized entry into her apartment for the following reasons: (a) although Defendant Officers

had Plaintiff's implied consent to initially enter her apartment as a result of her phone call to the

Schenectady Police, after Defendant Officers left the apartment to talk in private with Ms.

Fountain in the hallway, they did not have the consent or permission of Plaintiff to re-enter the

apartment; and (b) before re-entering the apartment, Defendant Officers knew that Plaintiff had

revoked Ms. Fountain's status as an invited guest and knew Ms. Fountain had been kicked out,

and therefore Defendant Officers could not rely on the consent of Ms. Fountain to re-enter the

apartment for the purpose of Plaintiff. (*Id.* at 11-16 [attaching pages "7" through "12" of Plf.'s

Opp'n Memo. of Law].)

In response to Defendants' second argument (regarding Plaintiff's claim for illegal

detention under the Fourth Amendment), Plaintiff argues that Defendant Officers did not have

probable cause to arrest her for Harassment in the Second Degree for the following reasons: (a)

the offense in question requires specific intent harass, annoy, or alarm another person; (b) here,

there was no evidence of such specific intent but merely a verbal argument between a mother and adult daughter over ownership of some underwear (albeit with "some de minimis touching" when Plaintiff attempted to "escort" Ms. Fountain off of the dresser in order to "get the underwear back" as "a disciplinary measure");[67] (c) the ruling to the contrary by Judge Blanchfield was dictum and in any even was incorrect; and (d) Defendants' argument that the Fourth Amendment overrides compliance with N.Y. Crim. Proc. Law § 140.10(1) is undermined by the cases of *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), *Payton v. New York*, 445 U.S. 573 (1980), *Riddick v. New York*, 445 U.S. 573 (1980), and *Ramos v. City of New York*, 298 F. App'x 84 (2d Cir. 2008). (*Id.* at 16-20 [attaching pages "12" through "16" of Plf.'s Opp'n Memo. of Law].)

In response to Defendants' third argument (regarding Plaintiff's state-law claims for false arrest, assault and battery, and negligence), Plaintiff concedes that the three referenced state-law claims should be dismissed because the notice of claim was filed more than one year after these claims had accrued. (*Id.* at 26 [attaching page "22" of Plf.'s Opp'n Memo. of Law].)

In response to Defendants' fourth argument (regarding Plaintiff's claim for excessive force under the Fourth Amendment), Plaintiff argues that, even assuming that Defendant Officers were making an arrest in their capacity as police officers (which Plaintiff disputes), a genuine issue of material fact exists regarding whether the amount of force used was unnecessary and excessive under the Fourth Amendment for the following reasons: (a) in determining the reasonableness of force used during an arrest, the Court is required to consider the nature and severity of the crime leading to the arrest, whether the suspect poses an immediate threat to the

---

[67]    Plaintiff argues that Defendant Officers "should have simply explained that the underwear were a gift and that Mrs. Regels could not be an Indian giver, and then they should have left." (Dkt. No. 39, at 18 [attaching page "14" of Plf.'s Opp'n Memo. of Law].)

safety of the officer or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight; (b) here, the crime of Harassment in the Second Degree was of low severity, Plaintiff posed no immediate threat Ms. Fountain or to Defendants, and Plaintiff was not "actively" resisting arrest or attempting to flee; (c) rather than arrest Plaintiff, Defendant Officers could have, and should have, issued her a summons to appear in court for the violation, or advised Ms. Fountain how to file a complaint for harassment and apply for an arrest warrant in City Court; and (d) instead, they used force against her (including throwing, twisting, grabbing, kneeing, and dragging) that was more than de minimis. (*Id.* at 20-25 [attaching pages "16" through "21" of Plf.'s Opp'n Memo. of Law].)

In response to Defendants' fifth argument (regarding Plaintiff's claims for malicious prosecution under the Fourth Amendment and state law), Plaintiff argues that she has established all of the elements of a claim of malicious prosecution with regard to both the Harassment charge and Resisting Arrest charge for the following reasons: (a) regarding the Harassment charge, Defendant Officers lacked probable cause to believe the proceeding on the charge could succeed due to the lack of evidence that Plaintiff intended to harass, annoy, or alarm Ms. Fountain (and, in any event, the existence of probable cause is not a defense where, as here, the arrest was on behalf of a citizen who is strictly liable for false arrest and malicious prosecution, and in whose shoes the arresting officers stand), and they acted with malice in the prosecution of the charge (given Defendant Farrand's prior acquaintance with Ms. Fountain, their deliberate attempt to circumvent state law in order to arrest Plaintiff, and their misstatement to Ms. Fountain that she could not drop the charges against Plaintiff); and (b) regarding the Resisting Arrest charge, Defendant Officers lacked probable cause to believe that the proceeding on *any* charge could

succeed (and, in any event, again, probable cause is irrelevant where there was a citizen's arrest), they acted with actual malice in arresting Plaintiff (given Defendant Farrand's prior acquaintance with Ms. Fountain and their deliberate attempt to circumvent state law in order to arrest Plaintiff), and the prosecution did terminate in Plaintiff's favor (in that the City Court dismissed the charge not for facial insufficiency but on the merits due to the absence of an arrest warrant, which could not have been cured through an amended complaint or information). (*Id.* at 21-27 [attaching pages "25" through "31" of Plf.'s Opp'n Memo. of Law].)

In response to Defendants' sixth argument (regarding Plaintiff's claim for municipal liability), Plaintiff argues that she has established the referenced claim for the following reasons: (a) General Order 0-36 did require police officers to make arrests when responding to all domestic incidents even if the offense occurred outside of their presence, as evident from Section IV.I.1. of that General Order; and (b) General Order 0-36 was the proximate cause of Plaintiff's unconstitutional arrest because Defendant Officers did not have probable cause to arrest her (thus rendering the City liable for the arrest even though it was a single incident). (*Id.* at 31-32 [attaching pages "27" and "28" of Plf.'s Opp'n Memo. of Law].)

In response to Defendants' seventh argument (regarding the defense of qualified immunity to Plaintiff's claim for invasion of privacy and illegal search under the Fourth Amendment, her claim for illegal detention under the Fourth Amendment, her claim for false arrest under state law, and her claim for excessive force under the Fourth Amendment), Plaintiff argues that the referenced defense is not available for the following reasons: (a) regarding Plaintiff's claim of invasion of privacy and illegal entry, it was objectively unreasonable for Defendant Officers to rely on Ms. Fountain's consent to re-enter Plaintiff's apartment in order to

arrest her (given their knowledge that Plaintiff was forcing Ms. Fountain to leave); (b) regarding

Plaintiff's claims of false arrest under the Fourth Amendment and state law, it was objectively

unreasonable for Defendant Officers to believe that Plaintiff had manifested the requisite intent

to harass, annoy, or alarm Ms. Fountain (given their knowledge that Plaintiff had merely

"initiated incidental physical contact" with Ms. Fountain for the sole purpose of recovering

underwear), and it was also objectively unreasonable for them to believe that they could perform

an arrest for a violation not committed in their presence; and (c) regarding Plaintiff's claim of

excessive force, it was objectively unreasonable for Defendant Officers to believe that a "street

takedown" was required to arrest Plaintiff, an older woman who posed no threat of escape or

danger, for a minor offense.  (*Id.* at 32-34 [attaching pages "28" through "30" of Plf.'s Opp'n

Memo. of Law].)

Finally, in support of her cross-motion for summary judgement, Plaintiff argues that

Defendant Officers are liable as a matter of law on her claims of false arrest and excessive force

for the following reasons: (a) because under New York Law Defendant Officers could neither

arrest Plaintiff for a violation that occurred outside of their presence nor effect a valid citizen's

arrest of her themselves as officers, the arrest that occurred for Harassment in the Second Degree

was a citizen's arrest by Ms. Fountain; (b) where there has been a citizen's arrest, and the arrestee

has been subsequently acquitted (as was Plaintiff here), the existence of probable cause is not a

defense to a claim of false arrest; (c) because Defendant Officers urged Ms. Fountain to make the

citizen's arrest, and took custody of Plaintiff following that citizen's arrest, they stand in Ms.

Fountain's shoes with regard to Plaintiff's claim of false arrest for Harassment in the Second

Degree, and are strictly liable for that false arrest; and (d) moreover, where there has been a

citizen's arrest, and the arrestee has been subsequently acquitted (again, as was Plaintiff here), any force used by police officers to take the arrestee into custody is per se excessive. (*Id.* at 5-11 [attaching pages "1" through "7" of Plf.'s Opp'n Memo. of Law].)

### 3. Defendants' Reply and Response

Generally, in their reply with regard to their motion for summary judgment, and in their response to Plaintiff's cross-motion for summary judgment, Defendants assert the following seven arguments. (*See generally* Dkt. No. 40. [Defs.' Reply Memo. of Law].)

First, argue Defendants, the Court should dismiss Plaintiff's first claim (for invasion of privacy and illegal search under the Fourth Amendment) for the following reasons: (a) Plaintiff concedes that she expressly and/or impliedly consented to Defendant Officers' entry into her apartment, and argues merely that they stepped out of her apartment to talk with Ms. Fountain about Plaintiff's impending arrest, and then re-entered her apartment without Plaintiff's consent to effectuate the arrest; (b) even if Defendant Officers did step out of Plaintiff's apartment (which they dispute), Plaintiff unquestionably did not revoke or otherwise withdraw her consent for them to enter until *after* she was advised that she was under arrest; and (c) at the very least, Defendant Officers' re-entry into Plaintiff's apartment was objectively reasonable, affording them qualified immunity. (*Id.* at 4-6 [asserting pages "2" through "4" of Defs.' Reply Memo. of Law].)

Second, argue Defendants, the Court should dismiss Plaintiff's second claim (for illegal detention under the Fourth Amendment) for the following reasons: (a) the facts asserted in Plaintiff's opposition memorandum of law (e.g., that she was merely attempting to "escort" Ms. Fountain off of the dresser) are wholly unsupported by the record evidence adduced by the parties; (b) police officers are permitted to rely on the complaining statements of a putative

victim, who is presumed to be reliable, especially when meeting officers face to face (as happened here); and (c) contrary to arguing that the Fourth Amendment "overrides" compliance with N.Y. Crim. Proc. Law § 140.10(1), Defendants simply set forth the well-settled point of law that a violation of that state statute (which provides additional restrictions over and above those imposed by the Fourth Amendment on the scope of police authority to arrest), does not rise to the level of a Fourth Amendment violation (rendering the cases cited by Plaintiff either inapposite or supportive of Defendants' argument). (*Id.* at 7-10 [asserting pages "5" through "8" of Defs.' Reply Memo. of Law].)

Third, argue Defendants, the Court should dismiss Plaintiff's third, fifth and ninth claims (for false arrest under state law, assault and battery under state law, and negligence under state law) because, by conceding the merit of their third argument for the dismissal of those claims, Plaintiff has effectively abandoned them. (*Id.* at 10-11 [asserting pages "8" and "9" of Defs.' Reply Memo. of Law].)

Fourth, argue Defendants, the Court should dismiss Plaintiff's fourth claim (for excessive force under the Fourth Amendment) for the following reasons: (a) factors relevant to an analysis of whether force was excessive under the Fourth Amendment include the need for the use of force, the relationship between the need for force and the amount of force used, and the extent of any injury; (b) here, a need for at least some force existed because, as Plaintiff acknowledges, after she was advised that she was under arrest, she told the officers to leave, retreated to her bedroom, and closed the door (thus attempting to evade arrest); (c) moreover, the amount of force used was minimal (consisting, at most, of pushing Plaintiff down onto a bed, crisscrossing her legs, twisting arms behind her back to affix handcuffs, holding down one of her arms with a

knee, and lifting her to an upright position); and (d) finally, Plaintiff's medical records are devoid of any reference to a causally related injury. (*Id.* at 11-13 [asserting pages "9" through "11" of Defs.' Reply Memo. of Law].)

Fifth, argue Defendants, the Court should dismiss Plaintiff's sixth and seventh claims (for malicious prosecution under the Fourth Amendment and state law) for the following reasons: (a) as an initial matter, Plaintiff's vicarious liability argument (i.e., that the existence of probable cause is irrelevant because Defendant Officers are vicariously and strictly liable as the agents or instigators of Ms. Fountain) is both unsupported by the cases cited by Plaintiff and unavailable to her at this late stage of the action (given that no vicarious liability theory was pled in her Amended Complaint); (b) in any event, regarding the Harassment charge, Plaintiff fails to adduce admissible evidence that Defendant Officers acted with malice in the prosecution of that charge, because her assertions about Defendant Farrand's prior romantic relationship with Ms. Livingston is pure speculation and conjecture; and (c) moreover, regarding the Resisting Arrest charge, Plaintiff's argument that the charge was dismissed on the merits (and not due to facial insufficiency) is wholly unsupported by the record (and, in any event, Defendants demonstrated that probable cause existed with regard to the Harassment charge, which necessarily satisfies probable cause relative to the Resisting Arrest charge). (*Id.* at 13-14 [asserting pages "11" and "12" of Defs.' Reply Memo. of Law].)

Sixth, argue Defendants, the Court should dismiss Plaintiff's eighth claim (for municipal liability) for the following reasons: (a) in misinterpreting Section IV.I.1. of General Order 0-36 as requiring that police officers to arrest parties to domestic incidents who have not committed an offense, Plaintiff overlooks Section II.E. of that General Order, which requires City of

Schenectady police officers to "[i]nvestigate all domestic incidents for evidence of criminal behavior in order to arrest offenders on *appropriate criminal charges*" (emphasis added); (b) Plaintiff also overlooks that Section IV.C.1. of the General Order explicitly requires that "[a]ll warrantless arrests shall be made in conformance with Section 140.10 of the Criminal Procedure Law . . ."; (c) in any event, noncompliance with N.Y. Crim. Proc. Law § 140.10(1) does not amount to a constitutional violation for purposes of municipal liability pursuant to 42 U.S.C. § 1983. (*Id.* at 15 [asserting page "13" of Defs.' Reply Memo. of Law]*.*)

Seventh, in response to Plaintiff's cross-motion for summary judgment, Defendants argue that Plaintiff's cross-motion should be denied for the following reasons: (a) as an initial matter, Plaintiff's entire cross-motion is premised on a vicarious theory of liability (whether arising from an agency relationship or conspiratorial relationship), which she never pled in her Amended Complaint and thus may not rely on in this late stage of the action; (b) in any event, Defendant Officers were authorized to take custody of Plaintiff because probable cause existed to arrest her for harassment (and *People v. Carroll*, 22 Misc.3d 755 [N.Y. City Ct., City of Rochester 2008] does not hold otherwise); and (c) indeed, Plaintiff's "strict liability" argument ignores both the defense of probable cause and the fact a violation of a state law (such as N.Y. Crim. Proc. Law § 140.10) is insufficient to establish a violation of the Fourth Amendment. (*Id.* at 16-17 [asserting pages "14" and "15" of Defs.' Reply Memo. of Law].)

## II.    GOVERNING LEGAL STANDARDS

### A.    Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court

will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at \*2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

To that recitation of the law, the Court would only add one point. In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at \*2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).[68]

---

[68] Alternatively, the court can deem the challenged claim abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Federal Exp.*, No. 12-1475, 2014 WL 4412333, at \*6 (2d Cir. 2014) ("Where a partial response to a motion is made– i.e., referencing some claims or defenses but not others–a distinction between pro se and counseled responses is appropriate. In the case of a pro se, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

### B. Standards Governing Plaintiff's Claims and Defendants' Defenses

Because the parties have (in their memoranda of law) demonstrated an adequate understanding of the legal standards governing Plaintiff's claims and Defendants' defenses, the Court will not recite those standards in their entirety in this Decision and Order, which is intended primarily for the review of the parties. Rather, the Court will merely recite portions of those standards as necessary in analyzing Plaintiff's claims in Part III of this Decision and Order.

### III. ANALYSIS

### A. Plaintiff's First Claim (for Invasion of Privacy / Illegal Search)

After carefully considering the matter, the Court dismisses Plaintiff's first claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds only one point.

In addition to analyzing the issue presented under the framework presented by Defendants (including the continuation of third-party consent by Ms. Fountain, and the delayed-revocation of Plaintiff's consent), the Court has analyzed it under an alternative framework for purposes of thoroughness. When Plaintiff gave Defendant Officers consent to enter her apartment, she gave them consent to enter her apartment's "curtilage." *See Aguilar v. Immig. and Customs Enforce. Div. of U.S. Dep't of Homeland Sec.*, 07-CV-8224, 2012 WL 1538431, at *6 (S.D.N.Y. Apr. 30, 2012) ("Consent to enter one's home . . . includes the curtilage . . . .").[69] The door-blocked

---

[69] *See also Nebraska v. Sutton*, 434 N.W.2d 689, 696 (Neb. 1989) (finding that, where "defendant and his wife both . . . gave oral permission for the investigating officers to search their residence for a gun," the consent covered search in "the curtilage of the home and in an area that could be described as part of the house"); *Woods v. Georgia*, 371 S.E.2d 865, 866 (Ga. 1988) (finding that ing that written consent to search "940 N. Jackson Street" "impliedly includes consent to search the curtilage").

"interior hallway" (through which Defendant Officers had to pass to enter the apartment) was part of the apartment's curtilage (if not part the third-floor apartment itself). *See, e.g., United States v. Lundin*, 47 F. Supp.3d 1003, 1015 (N.D. Cal. 2014) (recognizing that apartment's "interior hallway" was part of apartment's "curtilage"). When one has granted consent to police to enter her apartment and its curtilage for the purpose of responding to a domestic dispute, it is nonsensical to argue that police have "left" the apartment (and thus acquired a need to obtain *new* consent to "re-enter" it) by briefly entering its curtilage to take a step toward responding to the domestic dispute. Plaintiff attempts in vain to narrow the scope of the 911 call by drawing a line between her purpose for the 911 call (the arrest of Ms. Fountain) and the result of that call (her own arrest).

For all of these reasons, Plaintiff's first claim is dismissed.

**B.      Plaintiff's Second Claim (for False Arrest)**

After carefully considering the matter, the Court dismisses Plaintiff's second claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds five points.

First, setting aside the fact that Defendant Officers had probable cause to believe that Plaintiff acted an intent to harass, annoy or alarm Ms. Fountain based on the information given by Ms. Fountain and Plaintiff herself, Judge Blanchfield expressly determined that "the Court does find that probable cause exists for the arrest." *See, supra,* Part I.B. of this Decision and Order. The determination was necessary for Judge Blanchfield to reconcile his decision on Plaintiff's motion to dismiss the Resisting Arrest charge and the need for trial on the Harassment

charge.[70]  The Court notes that Plaintiff's motion to dismiss the Resisting Arrest charge raised the issue of lack of probable cause as an alternative ground for dismissal of the charge.[71]  As a result, Plaintiff is collaterally estopped from relitigating this probable-cause issue in this action.[72]

Second, in arguing that no probable cause of incriminating intent existed, Plaintiff places heavy reliance on Defendant Farrand's affinity for Ms. Fountain (due to their purported "mutual friend").  Plaintiff also places heavy reliance on her purported subjective intent to merely "escort" Ms. Fountain off of the dresser to find what was (she believed) her rightful property.  However, a probable cause determination focuses not on the arresting officer's affinities, or the arrestee's subjective intent, but the objective facts known to the arresting officer at the time of arrest.  *See Gonzalez v. City of Schnectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("This inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest."); *cf. Ricciutti v. NYC Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) ("Once an officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocense before making an

_____

[70]  (Dkt. No. 33, Attach. 22, at 100 [attaching page "90" of trial transcript, stating, "[T]he Court would note that . . . the resisting arrest charge had been dismissed . . . . That does not mean that there was no underlying basis for the the–for the arrest, necessarily.  And the Court does find, at this time, that even though the event did not occur in the officer's presence, . . . probable cause exists for the arrest.  Now, moving on to the issue here, for this trial . . . ."])

[71]  (Dkt. No. 24, Attach. 19, at 2 [containing affidavit-brief dated Aug. 13, 2012, arguing, "In addition, the conduct complained of by [Ms. Fountain] does not amount to even the level of a Violation of Harassment in the second degree"].)

[72]  *See, e.g., DeFranco v. Town of Irondequoit*, 06-CV-6442, 2009 WL 2957813, at *4 (W.D.N.Y. Sept. 11, 2009); *Nadal v. City of New York*, 964 N.Y.S.2d 100, 101 (N.Y. App. Div., 1st Dept. 2013); *Martin v. Rosenzweig*, 894 N.Y.S.2d 228, 230 (N.Y. App. Div., 3d Dept. 2010).

arrest.").  Here, the objective facts included an admission by Plaintiff that she had (during a

dispute) grabbed Ms. Fountain's arm in order to gain access to a dresser on which Ms. Fountain

was sitting, a complaint by Ms. Fountain regarding that contact, and a red mark on Ms.

Fountain's arm.

Third, as to Plaintiff's argument that Defendant Officers should have merely issued her a

summons to appear in court for the violation, the Fourth Amendment did not require this of

them.  *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable

cause to believe that an individual has committed even a very minor criminal offense in his

presence, he may, without violating the Fourth Amendment, arrest the offender.").  As judges of

this District have specifically recognized,

> There is no requirement under the *Fourth Amendment* that a police officer
> personally witness the conduct upon which he or she relies to establish the
> existence of probable cause . . . .   In considering a plaintiff's claims under
> *Section 1983*, the question is whether there has been a violation of a
> federal right, which here is claimed to be the *Fourth Amendment* . . . .
> Because [the officers] did have a sufficient factual basis to conclude that
> probable cause existed for the arrest of [Plaintiff], the mere fact that he did
> not personally witness the alleged conduct and may have acted in violation
> of state law is not sufficient to establish a violation of the *Fourth
> Amendment*.

*Williams v. Schultz*, 06-CV-1104, 2008 WL 4635383, at *7 (N.D.N.Y. Oct. 16, 2008) (Lowe,

M.J., adopted by Hurd, J.) (emphasis added) (internal quotation marks omitted).

Fourth, Plaintiff's vicarious liability theory is unavailing.  As an initial matter, Plaintiff

did not sue Defendant Officers for wrongfully encouraging Ms. Fountain to effect, or wrongfully

assisting her in effecting, a citizen's arrest of Plaintiff under the Fourth Amendment; rather, she

sued Defendant Officers for falsely arresting her under the Fourth Amendment.  *See, supra,* Part

I.A. of this Decision and Order. In any event, the Court does not read the case heavily relied on by Plaintiff (*New York v. Carroll*, 22 Misc.3d 755 [N.Y. City Ct., City of Rochester 2008]) as holding that under the Fourth Amendment a police officer may not rely on probable cause to arrest a person as a defense to a claim of false arrest when he has taken that person into custody following a citizen's arrest of the person for a noncriminal harassment violation that occurred outside the officer's presence (and the person has subsequently been acquitted); rather, that case held merely that under New York law a person cannot lawfully be prosecuted for resisting arrest during a police officer's attempt to take him into custody following a citizen's arrest for a noncriminal harassment violation that occurred outside the officer's presence. Without parsing in detail the differences between *Carroll* and the current case, generally the former differs from the latter in the following four ways: (1) the former focuses on a violation of state statutory law while the latter focuses on a violation of the Fourth Amendment; (2) the former focuses on the rights of an arrestee while the latter focuses on the rights of a police officer; (3) the former regards a criminal action while the latter regards a civil rights action; and (4) the former regards a false arrest for resisting arrest while the latter regards a false arrest for harassment in the second degree.

Fifth, at the very least, based on the current record, Defendant Officers are protected from liability on this claim as a matter of law by the doctrine of qualified immunity.

For all of these reasons, Plaintiff's second claim is dismissed.

## C. Plaintiff's Third, Fifth and Ninth Claims (for False Arrest, Assault and Battery, and Negligence)

After carefully considering the matter, the Court dismisses Plaintiff's third, fifth and ninth claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds only that, in the alternative, the Court dismisses these claims because, by failing to oppose this argument, Plaintiff has lightened Defendants' burden to one of facial merit, which they easily met.

For all of these reasons, Plaintiff's third, fifth and ninth claims are dismissed.

## D. Plaintiff's Fourth Claim (for Excessive Force)

After carefully considering the matter, the Court dismisses Plaintiff's fourth claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds only two points.

First, while Plaintiff may not have been "actively" resisting arrest or attempting to flee at the very moment she was handcuffed, she had immediately prior to that moment attempted to evade arrest by retreating to her room, shutting the door on Defendant Officers, and pulling her wrist free from Defendant Giardono's grasp. As a result, the need for at least some force existed. Furthermore, some force was all that was used: Plaintiff was handcuffed on a *bed*, the incident did not last very long, and her medical records showed no causally related injury.

The Court notes that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1986) (internal quotation marks omitted). As a result, "a de minimis use of force will rarely suffice to state a constitutional claim." *Topolski v. Cottrell*, 11-CV-1216, 2012 WL

3264927, at *3 (N.D.N.Y. Aug. 9, 2012) (D'Agostino, J.). Moreover, "de minimis injury can serve as conclusive evidence that de minimis force was used." *Washpon v. Parr*, 561 F. Supp.2d 394, 407 (S.D.N.Y. 2008) (internal quotation marks omitted). "Injuries held to be de minimis for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches with a cut inside the mouth." *Milo v. City of New York*, 14-CV-1172, 2014 WL 5933091, at *6 (E.D.N.Y. Nov. 11, 2014) (internal quotation marks omitted).

Second, at the very least, based on the current record, Defendant Officers are protected from liability on this claim as a matter of law by the doctrine of qualified immunity.

For all of these reasons, Plaintiff's fourth claim is dismissed.

### E. Plaintiff's Sixth and Seventh Claims (for Malicious Prosecution)

After carefully considering the matter, the Court dismisses Plaintiff's sixth and seventh claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds only two points.

First, Plaintiff's argument that the Resisting Arrest change terminated in her favor (because its dismissal was not based on facial insufficiency) is based on evidence not contained in the record (e.g., the fact that the defect could not have been cured through an amended complaint or information) and indeed ignores the express language of Judge Blanchfield's dismissal. In any event, probable cause existed to prosecute Plaintiff for Resisting Arrest based on her attempt to evade arrest (which, again, involved her retreating to her room, shutting the door on Defendant Officers, and pulling her wrist free from Defendant Giardono's grasp).

Second, the Court finds that probable cause existed to prosecute Plaintiff for Harassment

in the Second Degree, for the reasons set forth above in Part III.B. of this Decision and Order. Alternatively, the Court finds that Plaintiff has adduced no admissible record evidence demonstrating or tending to demonstrate that Defendant Officers acted with improper motive (i.e., malice) in the prosecution of the Harassment charge. Plaintiff's assertion that Defendant Farrand had an affinity for Ms. Fountain due to a prior romantic relationship with Ms. Livingston is based on speculation and conjecture. Moreover, Plaintiff argument that Defendant Farrand intentionally misadvised Ms. Fountain regarding any right she had to drop her Harassment charge against Plaintiff at the police station is not supported by the record.

For all of these reasons, Plaintiff's sixth and seventh claims are dismissed.

F.    **Plaintiff's Eighth Claim (for Municipal Liability)**

After carefully considering the matter, the Court dismisses Plaintiff's eighth claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds only two points.

First, as an initial matter, the Court finds that no constitutional violation occurred that could have been caused by *any* municipal policy or custom (much less by General Order 0-36).

Second, even if such a violation occurred, it was not caused by General Order 0-36. For the sake of brevity, the Court will not linger on Plaintiff's myopic reading of General Order 0-36, and the dearth of admissible record evidence that Defendant Officers were relying on it, and not the facts before them, when they arrested and charged Plaintiff. Just as important is the fact that, if Plaintiff were correct that General Order 0-36 required police officers to make arrests when responding to *all* domestic incidents even if the offense occurred outside of their presence, then either she or Ms. Fountain would have been arrested on the evening of June 3, 2012, when

46

Officer Savignano responded to Plaintiff's call to the Schenectady Police Department due to an argument she was having with Ms. Fountain.

For all of these reasons, Plaintiff's eighth claim is dismissed.

### G.      Plaintiff's Claim for Punitive Damages

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memorandum of law. *See, supra,* Part I.C.1. of this Decision and Order. To those reasons, the Court would add only that, because Plaintiff never opposed this argument, Defendants' burden with regard to it was lightened to one of facial merit, which they easily met.

### H.      Plaintiff's Cross-Motion for Summary Judgment

After carefully considering the matter, the Court denies Plaintiff's cross-motion for the reasons stated in Defendants' reply memorandum of law. *See, supra,* Parts I.C.3. of this Decision and Order.  To those reasons, the Court adds merely that it rejects Plaintiff's vicarious liability theory (which forms the basis of her cross-motion) for the same reasons as stated above in Part III.B. of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 24) is

**<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 33) is

**<u>DENIED</u>**.

The Clerk is directed to enter judgment for Defendants and close this case.

Dated: June 25, 2015
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge